# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACK KAHRIGER, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 23-4384 |
| XAVIER BECERRA, | |
| *Defendant.* | |

**Pappert, J.**                                              **November 24, 2025**

## MEMORANDUM

*Pro se* plaintiff Jack Kahriger was in a romantic relationship with a coworker for over two years. After the relationship ran its course, the woman allegedly began to harass him. That led Kahriger, a supervisor, to send numerous text messages to one of his female subordinates, who he viewed as an ally in his campaign against his ex-girlfriend. The texts spread pernicious and vindictive gossip about his ex, setting off a chain of toxic workplace events which Kahriger's supervisors in the United States Department of Health and Human Services investigated.

The investigation resulted in Kahriger's demotion and transfer. Kahriger subsequently sued then-Secretary Xavier Becerra under Title VII of the Civil Rights Act, alleging disparate treatment sex discrimination, retaliation, and a hostile work environment. HHS moved for summary judgment on all claims, and after reviewing the parties' submissions and holding oral argument, the Court grants the motion.

No record evidence presents an issue of material fact as to whether Kahriger's sex had anything to do with his demotion and transfer. He propounds speculative, conclusory and conspiratorial theories that HHS discriminated against him because the

1

only people who complained about, investigated and ultimately disciplined him were women.  The record bears none of that out, showing instead that Kahriger was correctly disciplined for conduct detrimental to the workplace and to HHS's ability to properly manage it.

I

Since 1989, Kahriger has worked for HHS's Office of Inspector General.  *See* (Second Am. Compl. ¶ 15, Dkt. No. 23).  He started as an auditor in the Philadelphia Office of Audit Services ("OAS"), and HHS promoted him to senior auditor in 1998 and then to Assistant Regional Inspector General for Audit Services ("ARIGAS") in January of 2017.  As an ARIGAS, Kahriger led a team of six auditors and reported directly to Jason Jelen, the Regional Inspector General for Audit Services ("RIGAS").  *See* (*Id.* ¶ 21).

Kahriger dated coworker Denise DeLeon from July of 2012 to October of 2014.  (*Id.* ¶¶ 33, 35, 37.)  After they broke up, Kahriger claims DeLeon harassed him and others in the office.  She purportedly did so by posting his picture and personal information on dontdateaplayer.com—a website for individuals to share negative information about people they dated.  (*Id.* ¶¶ 45–49.)

From May to July of 2017, Kahriger repeatedly disparaged DeLeon in texts, including the following, to Sheila Warriner, a senior auditor then on his team who was also no fan of DeLeon's:

- "She is lighting too many fires!  I don't know how she handles all of the games she starts and then follows through with it must be exhausting.  But she has the mentality of an armed shooter who has hostages and has the 'you are not taking me.'"

2

- "She has to know by now that many don't like her and I'm sure that doesn't feel good but she is too stubborn to modify her behavior. I can't argue she is acting like one. What does she get out of it? Just stop. No one did anything to warrant lunatic reactions. She is starting to isolate herself also?"

- "She is trying to trash my reputation because she doesn't want anyone else to be with me."

- "The office terrorist strikes again! I need to be careful she doesn't drive her car on the boardwalk this week!"

- "It is all based on jealousy Sheila. . . . She never married. She never went to college. You make more money. You are much younger and you are attractive enough to make her loose [sic] it. She is thoroughly jealous."

- "It is hard to pick the best path to take against her. If you can get her on camera entering your space and doing something she would be dead! She is getting more brazen and she is doing stuff more often. She is really going to slip up. She is pathological!"[1]

- "It is a serial killer from England. I'm watching a show on Netflix. This is a female serial killer and she has a 'star' tattoo on her right check. She reminds of Denise. The psychiatrist that interviewed said the traits of psychopathy: deceitful, irresponsible, impulsive, lacking in empathy and remorse and focused on her own needs. Denise marches [sic] this description except maybe you can argue the irresponsible."[2]

(Kahriger Texts at 3, 7, 9, 11, 13, 16, 18, 20, 22, 24, 26, 29, 33, Def.'s Ex. 7, Dkt. No. 42-8 (citation modified)); (Dec. 13, 2017 Letter from Assistant Inspector General for Audit Services Amy Frontz to Kahriger at 4–6, Def.'s Ex. 6, Dkt. No. 42-7.) Warriner agreed with many of Kahriger's texts, calling DeLeon "the 'c' word," "certifiably nuts," "stupid on top of psychotic," and "a child." (Second. Am. Compl. ¶¶ 41, 105–08.)

---

[1]    Kahriger sent these texts after an unknown person sent drugs to Warriner's residence and vandalized photos on her desk. *See* (Second Am. Compl. ¶¶ 43, 56).

[2]    Before these texts, Kahriger sent Warriner a photo of a woman holding a knife, writing "Administrative Officer and Office Terrorist!" *See* (Kahriger Text to Warriner, Def.'s Ex. 9, Dkt. No. 42-10).

But when Warriner and DeLeon eventually resolved their own differences, Kahriger called Warriner into his office on September 21 and asked whether she and DeLeon had reconciled. (Kahriger Complaints at 31, Def.'s Ex. 4, Dkt. No. 42-5.) Warriner confirmed they had, and Kahriger responded that he now had a "trust issue" with her and suggested she request a transfer to a different audit team. *See* (Second Am. Compl. ¶ 81).

Warriner complained about Kahriger the next day to HR Director Cynthia Stasch and Office of Counsel Attorney Susie King. (Kahriger Complaints at 2.) She cited his texts, said Kahriger made her feel uncomfortable, and asked to transfer to another ARIGAS. (*Id.* at 3–5.) DeLeon sent a similar complaint that same day, *see* (*Id.* at 9), as did auditors Velena Flores and Lynne Pohler on September 26, *see* (*Id.* at 7–8, 13–19).

On the evening of October 6, DeLeon and Flores returned to the office while Kahriger was still there. Flores allegedly yelled at Kahriger during that encounter, saying he is a "fucking doofus" and "ain't getting no fucking pussy!" (Oct. 10, 2017 Email from Kahriger to Jelen, Def.'s Ex. 14, Dkt. No. 42-15.) Kahriger recorded the incident on his phone and complained about it to Jelen four days later. (*Id.*)

Warriner sent King and Stasch on October 10 screenshots of her text messages with Kahriger. (Oct. 10, 2017 Emails from Warriner to King & Stasch, Def.'s Ex. 7.) That same day, Assistant Inspector General Frontz placed Kahriger on telework status until further notice. (Oct. 10, 2017 Email from Jelen to Kahriger, Def.'s Ex. 34, Dkt. No. 42-35.)

From October 18 to November 8, King and Stasch interviewed seven Philadelphia OAS employees about complaints made against Kahriger and Jelen.[3] *See generally* (HHS Interview Memoranda, Def.'s Ex. 5, Dkt. No. 42-6). The two interviewed Kahriger for six hours on October 18, during which he admitted to texting Warriner about DeLeon. (*Id.* at 33–36); (Oct. 24, 2017 Email from Stasch to Kahriger, Def.'s Ex. 27, Dkt. No. 42-28). He blamed DeLeon for creating the "Don't Date a Player" web post and showed them the video of Flores from October 6. *See* (HHS Interview Memoranda at 28, 37–38). King reported the web post to HHS's Office of Investigations, which reviewed it and declined to investigate further. *See* (*Id.* at 28).

After his interview, Kahriger told Jelen that DeLeon sent him offensive texts while the two were dating in 2014. (Kahriger Dep. at 19:22–20:14, Def.'s Ex. 13, Dkt. No. 42-14.) In them, DeLeon called ARIGAS Robert Baiocco a "greasy wop" and a "Catholic hypocrite" who she hoped would "get[] mangled to death in a car accident or get[] that fatal flesh eating disease." (2014 Kahriger & DeLeon Texts, Def.'s Ex. 26, Dkt. No. 42-27.) Jelen encouraged Kahriger to send Baiocco those texts, and he did so on October 22. *See* (Oct. 22, 2017 Email from Kahriger to Baiocco, Dkt. No. 51-10); (Kahriger Dep. at 19:22–21:8. Upset by DeLeon's texts, Baiocco told Kahriger he would file a hostile work environment claim against her and list him as a witness, *see* (Kahriger Dep. at 21:9–24:19), which he did on November 27, *see* (Baiocco Dep. at 13:11–14:20, Def.'s Ex. 28, Dkt. No. 42-29).

On December 13, Frontz sent Kahriger a letter demoting him to senior auditor and transferring him to Trenton OAS. (Dec. 13, 2017 Letter from Frontz to Kahriger.)

---

[3]     King and Stasch interviewed Jelen, Kahriger, Flores and DeLeon as well as ARIGASs Nicole Freda, Bill Grayson and Len Piccari. *See generally* (HHS Interview Memoranda).

Frontz wrote that Kahriger "undermined the agency's ability to manage the workplace" by sending unprofessional texts to Warriner while she was under his supervision.[4]  (*Id.* at 4–7.)  His demotion and transfer became effective on December 24, and Kahriger has since worked at Trenton OAS.  (Oct. 31, 2025 Hr'g at 50:7–14, Dkt. No. 56.)

II

Summary judgment is proper if the pleadings, discovery, disclosure materials and affidavits present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Smathers v. Mutli-Tool, Inc. / Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A mere scintilla of evidence in support of the nonmoving party will not suffice; there must be evidence from which a jury could reasonably find for the nonmoving party.  *Id.* at 252.

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 286 (3d Cir. 2009).  But it may not make credibility determinations or weigh the evidence in considering motions for summary judgment.  *See Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

---

[4]    Frontz also stated that Kahriger committed this misconduct during a one-year probationary period for new supervisors.  (Dec. 13, 2017 Letter from Frontz to Kahriger at 2); *see also* 5 C.F.R. § 315.904(a) (requiring an employee "to serve a probationary period . . . upon initial appointment to a supervisory and/or managerial position").

6

III

Kahriger contends HHS demoted and transferred him because he is a man.  Title VII prohibits an employer from discriminating against an employee based on sex.  42 U.S.C. § 2000e–2(a).  Such a claim is evaluated under the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Kahriger must first establish a *prima facie* case of discrimination.  If so, HHS must then articulate a legitimate, nondiscriminatory reason for its adverse employment action.  If HHS does so, the burden shifts back to Kahriger to prove by a preponderance of the evidence that HHS's stated reason was a pretext for discrimination.  *See Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

A

To establish a *prima facie* claim of sex discrimination, Kahriger must show: (1) he belongs to a protected class, (2) HHS took an adverse employment action against him, (3) he was qualified for his position and (4) the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802).

Only the fourth element is at issue here.  Kahriger attempts to satisfy it by: (1) referencing prior sex discrimination he purportedly faced, (2) pointing to similarly situated female employees who supposedly received more favorable treatment even though they engaged in similar conduct and (3) citing alleged sex discrimination against other men in the office.  *See* (Pl.'s Mem. of L. in Opp'n at 2, Dkt. No. 48).

7

1

A male plaintiff can support an inference of discrimination with statements or actions by supervisors indicating animus against men.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002).  Kahriger tries to do so by citing a prior investigation into male employees at Philadelphia OAS, a failure to investigate his complaints, and statements from HR Director Camelia Harris and auditor Lynne Pohler.  *See* (Pl.'s Mem. of L. in Opp'n at 2–7).

Kahriger first references an investigation HHS conducted in 2016 into men allegedly rating women in the office based on their appearance.  But there is nothing in this record to show any discriminatory animus played a role in that investigation.  HHS interviewed Kahriger and four other employees about those claims and disciplined no one.  *See* (May 16, 2016 OAS Mgmt. Inquiry, Def.'s Ex. 36, Dkt. No. 42-37).  Kahriger concedes he suffered "no tangibly adverse employment actions" as a result, *see* (Pl.'s Mem. of L. in Opp'n at 3), and was even promoted the next year, *see* (Jan. 22, 2017 Kahriger SF-50, Def.'s Ex. 1, Dkt. No. 42-2); *see also Henry v. City of Allentown*, No. 12-1380, 2013 WL 6409307, at *7 (E.D. Pa. Dec. 9, 2013) (finding that investigations without negative consequences are not adverse employment actions).

Kahriger claims next that HHS never looked into his complaints about DeLeon or Flores, but the record dispels that assertion.  King and Stasch spent six hours interviewing Kahriger.  *See* (Oct. 24, 2017 Email from Stasch to Kahriger); *see also McFalls v. BrightView Landscapes, LLC*, No. 18-2871, 2020 WL 1922828, at *7 (E.D. Pa. Apr. 21, 2020) (rejecting a failure-to-investigate claim "when the employer has engaged in a good-faith investigation").  King reported the web post to HHS's Office of

Investigations, and it determined no further investigation was needed.  *See* (HHS Interview Memoranda at 28).  King and Stasch also interviewed DeLeon and Flores about Kahriger's accusations.  DeLeon denied creating the web post, and Stasch "counseled" Flores about her "unprofessional conduct."  *See* (*Id.* at 2, 6–7).  And to the extent HHS failed to investigate additional complaints Kahriger and Jelen made about others, *see* (Pl.'s Mem. of L. in Opp'n at 6–7, 10, 14, 17–18), Kahriger never connects that failure with animus toward men.  *See Ramara, Inc. v. Westfield Ins.*, 814 F.3d 660, 666 (3d Cir. 2016) ("[T]he non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment.").

Kahriger also contends that Harris told him at an August 3 conference that "[t]his agency doesn't treat men fair."  *See* (Hr'g at 62:3–63:4).  He similarly cites an October 5 email from Pohler thanking King and Stasch for "working hard to help us out."  *See* (King Dep. at 38:9–14, Dkt. No. 49-2).  But "[s]tray remarks by nondecision-makers . . . are rarely given great weight, particularly if they were made temporally remote from the date of decision."  *Ezold v. Wolf*, 983 F.2d 509, 545 (3d Cir. 1992) (citation modified).  Neither Harris nor Pohler supervised Kahriger, nor was either involved in any decision to demote and transfer him.  *See* (Apr. 4, 2017 Phila. OAS Org. Chart, Def.'s Ex. 3, Dkt. No. 42-4); (HHS Interview Memoranda).  Harris purportedly made her comment on August 3—a month before anyone complained to King or Stasch about Kahriger and four months before Frontz demoted and transferred him.  *See Jarmon v. Trader Joe's Co.*, 660 F. Supp. 3d 357, 364 (E.D. Pa. 2023) (declining to find animus based on a racist statement made thirteen months before the

9

plaintiff's adverse employment action).  And no reasonable juror could conclude from Pohler's email that King, Stasch or Frontz somehow had it out for men.[5]

2

Kahriger next argues that Warriner, Flores and DeLeon received better treatment than he did despite engaging in "similar" conduct.  *See* (Pl.'s Mem. of L. in Opp'n at 7–20).  Comparator evidence is evidence "that the employer has treated more favorably similarly situated persons not within the protected class."  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998).  Comparators are "employees [who] dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2001))).  The plaintiff must be similarly situated to the purported comparators "in all relevant respects."  *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011).

Kahriger cannot demonstrate on this record that similarly situated female employees were treated more favorably than he was.  Kahriger had a different title, GS grade and salary than Warriner, Flores and DeLeon:

| Name | Title | Grade | Pay | Pay Compared to Kahriger |
|---|---|---|---|---|
| Jack Kahriger | ARIGAS | GS-14, Step 6 | $127,371.00 | |
| Sheila Warriner | Auditor | GS-13, Step 4 | $101,625.00 | 20 percent less |
| Velena Flores | Auditor | GS-12, Step 4 | $85,464.00 | 33 percent less |
| Denise DeLeon | Administrative Officer | GS-12, Step 4 | $85,464.00 | 33 percent less |

---

[5]    Kahriger also refers to Flores's October 6 statement, *see* (Hr'g at 82:13–83:13), but she wasn't his supervisor, *see* (Phila. OAS Org. Chart), and her statement reveals no animus toward men.

*See* (Jan. 2017 SF-50s, Def.'s Ex. 12, Dkt. 42-13).

Kahriger's responsibilities and authority also differed from those of his purported comparators. He was one of five ARIGASs reporting to RIGAS Jelen, *see* (Phila. OAS Org. Chart), and served as acting RIGAS when Jelen stepped away, *see* (Oct. 24, 2017 Email from Kahriger, Def.'s Ex. 16, Dkt. No. 42-17). Kahriger—but not Flores, Warriner or DeLeon—attended manager meetings. *See* (Aug. 15 Email from Jelen to ARIGAS, Def.'s Ex. 17, Dkt. No. 18). And a team of six auditors, including Warriner, reported to Kahriger. (Phila. OAS Org. Chart). No one reported to Warriner, Flores or DeLeon. (*Id.*)

Kahriger asserts he and Warriner had "essentially the same" responsibilities, *see* (Pl.'s Mem. of L. in Opp'n at 19), but no reasonable juror could conclude as much. Kahriger had "the full realm of supervisory authorities for subordinate staff," *see* (GS-14 Supervisory Auditor Position Description at 5, Def.'s Ex. 23, Dkt. No. 42-24), which included:

- Planning work and preparing schedules for subordinates;

- Giving advice or instructions to subordinates on work and administrative matters;

- Developing performance standards and conducting performance reviews;

- Interviewing candidates for positions and recommending employees for promotion or reassignment;

- Hearing and resolving complaints from employees and referring group grievances to a higher-level supervisor;

- Effecting minor disciplinary measures, such as warnings and reprimands;

- Reviewing and approving serious disciplinary actions involving nonsupervisory subordinates;

- Reviewing and approving leave requests and expenses for subordinates;

- Referring subordinates for awards or bonuses and changes in position classification; and

- Receiving details when a subordinate started and stopped work.

*See* (*Id.*); (Kahriger Dep. at 116:15–117:2).  And Kahriger performed many of these tasks for his team, including Warriner.  *See* (*Id.* at 116:2–117:2, 121:19–122:8); (2017 Audit Team Performance Reviews, Def.'s Ex. 18, Dkt. No. 42-19); (May 2, 2017 Email from Kahriger to Warriner, Def.'s Ex. 22, Dkt. No. 42-23).

Warriner, Flores and DeLeon had none of these responsibilities.  Flores and Warriner kept their ARIGAS informed of job progress, *see* (GS-13 Auditor Position Description at 3–4, Def.'s Ex. 24, Dkt. No. 42-25), and DeLeon performed administrative tasks like reviewing travel vouchers or ordering supplies, *see* (Kahriger Dep. at 24:20–25:18); *see also Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013) ("[A]n employee who holds a different job in a different department is not similarly situated."); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) (holding that two employees with different positions are not similarly situated).

Kahriger's misconduct also differs from his comparators.  Frontz disciplined Kahriger because he was a supervisor, sent inappropriate texts to a subordinate about a coworker and suggested Warriner leave his team, *see* (Letter from Frontz to Kahriger at 2).  Warriner, Flores and DeLeon did nothing of "comparable seriousness."  *See Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (citation omitted).

3

Without comparator evidence, an employee can establish an inference of discrimination with evidence of similar sex discrimination. *See Swierkiewicz*, 534 U.S. at 511–12. Kahriger cites to "adverse actions" HHS allegedly took against RIGAS Jason Jelen and ARIGAS Robert Baiocco, such as a letter Frontz sent to Jelen proposing to downgrade him and an investigation by the Federal Protective Services into Baiocco for threatening to kill DeLeon. *See* (Pl.'s Mem. of L. in Opp'n at 21–25).

But HHS never took an adverse employment action against either Baiocco or Jelen. Both voluntarily relocated to different offices, and neither said HHS disciplined them. *See* (Jelen Dep. at 69:2–19, Def.'s Ex. 25, Dkt. No. 42-26 ("It was a voluntary reassignment."); (Baiocco Dep. at 51:7–53:17 ("I put in for the transfer.")). Baiocco even received a higher salary and increased monthly pension after his move. *See* (Baiocco Dep. at 51:7–53:7). And nothing in the record indicates that Jelen received his letter because he is a man. *See* (Dec. 20, 2017 Letter from Frontz to Jelen, Dkt. No. 51-1).

B

Even if Kahriger could establish his *prima facie* claim, HHS's burden of articulating a legitimate, nondiscriminatory reason for its actions is "relatively light" and satisfied with evidence that "would permit a conclusion that it took the adverse employee action for a non-discriminatory reason." *Burton*, 707 F.3d at 426 (citation omitted). HHS demoted and transferred Kahriger because he "undermined the agency's ability to manage the workplace efficiently and in [a] professional manner" and did not "reflect the skills needed to be successful in [a] supervisory position." *See* (Dec. 13, 2017 Letter from Frontz to Kahriger at 7). Frontz cited Kahriger's texts to

13

Warriner in which he called DeLeon "[t]he office terrorist," likened her to "a serial killer from England," and said she had the "traits of psychopathy" and "the mentality of an armed shooter." (Kahriger Texts at 7, 18, 33.) He said DeLeon was "jealous" because Warriner was "attractive enough to make her loose [sic] it."[6] (*Id.* at 26.) When he learned she and DeLeon reconciled, he suggested Warriner leave his team. *See* (Second Am. Compl. ¶ 81).

To show pretext, Kahriger must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton*, 707 F.3d at 427. When a plaintiff challenges the credibility of the employer's proffered justifications, he must adduce evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* The plaintiff "must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc).

No reasonable juror could conclude that HHS's justification for Kahriger's demotion and transfer is unworthy of belief or so plainly wrong that it was pretextual.

---

[6]    Kahriger insists his texts must be considered in the context of his conversation with Warriner. *See* (Pl.'s Mem. of L. in Opp'n at 23). Whatever their context, the messages were grounds for HHS's actions. *See, e.g.*, *Carroll v. Guardant Health, Inc.*, 511 F. Supp. 3d 623, 645 (E.D. Pa. 2021) (finding that "unprofessional and offensive comments" establish a legitimate, nondiscriminatory reason).

*See Burton*, 707 F.3d at 430 (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 310 (3d Cir. 2012)).  Kahriger admits to texting Warriner about DeLeon and suggesting she leave his team.  *See* (HHS Interview Memoranda at 33–36); (Second Am. Compl. ¶ 81).  He conclusorily claims that HHS "misused" the Whistleblower Protection Law; "made up" an excuse to avoid investigating DeLeon and thus violated its own policies[7]; and acted "contrary to The Privacy Law of 1974."  *See* (Pl.'s Mem. of L. in Opp'n at 11, 15–16).  He then assumes gender bias because women investigated him and speculates, without any evidence to back it up, that King tampered with the investigation by speaking with complainants.  *See* (Hr'g at 65:16–66:24).  But Kahriger cannot show pretext by "rely[ing] merely upon bare assertions, conclusory allegations or suspicions."  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

IV

Kahriger additionally claims HHS demoted and transferred him in retaliation for his support of Baiocco's EEO action against DeLeon.  *See* (Kahriger Dep. at 33:7–18).  Title VII prohibits an employer from retaliating against an employee for complaining about, or reporting, discrimination or retaliation.  42 U.S.C. § 2000e–3(a).  Absent direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework governs such claims.  Here again, Kahriger must first establish a *prima facie* case of retaliation.  Once met, the burden shifts to HHS to advance a legitimate, nonretaliatory reason for Kahriger's demotion and transfer.  If satisfied, Kahriger must show both that HHS's explanation was false and that retaliation was "the real reason"

---

[7]    Even if HHS violated its own policy, Kahriger never specifies how that relates to his sex.  *See Andersen v. Mack Trucks, Inc.*, 118 F. Supp. 3d 723, 742 (E.D. Pa. 2015), *aff'd*, 647 F. App'x 130 (3d Cir. 2016) ("[A] mere violation of policy alone cannot constitute evidence of pretext.").

for its actions.  *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006) (citation omitted).

A

To establish a *prima facie* retaliation case, Kahriger must show: (1) he engaged in protected activity, (2) HHS took an adverse employment action against him and (3) there was a causal connection between his protected activity and the adverse employment action.  *Id.* at 340–41.

Kahriger can demonstrate causation with: (1) a "temporal proximity" between the protected activity and adverse action that is "unusually suggestive of retaliatory motive," (2) a "pattern of antagonism" toward him after he sent purportedly helpful evidence to Baiocco, (3) inconsistencies in HHS's explanations for the adverse action or (4) other evidence in the record from which a "reasonable factfinder" could otherwise infer causation.  *See Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259–60 (3d Cir. 2017) (citation modified).

Kahriger fails to satisfy any of the above.  His argument turns on the temporal proximity between his email to Baiocco and his discipline.  *See* (Hr'g at 111:14–15). Kahriger never argues that HHS displayed a pattern of antagonism after his email, offered inconsistent explanations for his demotion and transfer, or did anything else to suggest causation.

1

Kahriger can defeat summary judgment on his retaliation claim by showing that HHS's "knowledge of [his] protected activity" was "very close" in time to the "adverse employment action."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per

16

curiam) (citation omitted).  But those "responsible for the adverse action" must know of his protected conduct "at the time they acted."  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015).

Frontz was ultimately responsible for demoting and transferring Kahriger.  King and Stasch discussed that decision with her, but neither made the final decision.  King merely sent Frontz the details of her investigation and recommended she discipline Kahriger.[8]  *See* (Nov. 28, 2017 Email from King to Frontz, Def.'s Ex. 37, Dkt. No. 42-38); (Dec. 1, 2017 Email from King to Frontz, Def.'s Ex. 39, Dkt. No. 42-40).  So the relevant data point is when Frontz "made [the] decision" to demote and transfer Kahriger. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 801 (3d Cir. 2003).

The record makes clear that Frontz did so before she knew about Baiocco's EEO complaint, let alone Kahriger's involvement in Baiocco's case.  Frontz, King and Stasch met on November 29, 2017 to discuss "investigation and next steps re Jack Kahriger." *See* (Nov. 27, 2017 Email from King to Wilson, Def.'s Ex. 38, Dkt. No. 42-39).  King circulated a legal memorandum before that meeting titled "Conduct_Unbecoming_a_Supervisor_27Nov2017."  (Nov. 28, 2017 Email from King to Frontz.)  Then on December 1 at 1:31 p.m., King sent Frontz a draft document based on their "earlier meeting" with the name "Removal from Supervisory Position Prior to Completion of Probationary Period."  *See* (Dec. 1, 2017 Email from King to Frontz).

Yet Frontz first learned about the Baiocco complaint nearly two hours later when Stasch forwarded it to her at 4:01 p.m. in an email that never mentioned Kahriger.  *See* (Dec. 1, 2017 Email from Stasch to Frontz, Def.'s Ex. 41, Dkt. No. 42-42);

---

[8]    Kahriger does not argue that Frontz was a "cat's paw" for a decision King made, and there is no support in any event for such a theory.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011).

17

*see also Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000) (finding that critical performance reviews could not have been retaliatory because they occurred "prior to" the protected activity); *Giuseffi v. Nielsen*, No. 18-622, 2018 WL 6622998, at \*4–5 (E.D. Pa. Dec. 18, 2018) (similar).

Even if King made or influenced the decision to discipline Kahriger, it would have been before discovering his protected activity. King learned of Baiocco's complaint on December 1 at 10:12 a.m. when DeLeon emailed her. (Dec. 1, 2017 Email from DeLeon to King & Stasch, Def.'s Ex. 40, Dkt. No. 42-41.) Nothing in that email or the document attached mentioned Kahriger. *See* (*Id.*); (Dec. 1, 2017 Email from Stasch to Frontz at 4–6). King emailed EEO counselor Robert Brady about DeLeon's email at 11:00 a.m. *See* (Dec. 1, 2017 Email from King to Brady, Dkt. No. 42-41). Brady responded at 2:42 p.m.—nearly an hour after King's 1:31 p.m. email to Frontz—that Kahriger "may have insight into this situation." (Dec. 1, 2017 Emails re Baiocco.)

Kahriger nonetheless asserts that Frontz made her decision after December 1, referring to a December 6 email where King told Warriner that "management is determining what actions to take." (Dec. 6, 2017 Email from King to Warriner, Dkt. No. 51-9.) But in that same email, King said their investigation "has been completed" and she could not disclose "any information about another employee" "[d]ue to personnel privacy reasons." (*Id.*) And the record evidence shows that Frontz decided to discipline Kahriger well before December 6. King created a memorandum on November 27 about Kahriger acting inappropriately as a supervisor, discussed it with Frontz on November 29, and mentioned that discussion in the December 1 draft letter removing Kahriger as supervisor. *See* (Nov. 28, 2017 Email from King to Frontz); (Dec. 1, 2017

18

Email from King to Frontz); *see also Kaufmann v. GMAC Mortg.*, 229 F. App'x 164, 169 (3d Cir. 2007) (finding that no temporal proximity because the plaintiff's adverse employment action had been discussed "weeks prior" to the ultimate decision).

B

Even if a question of fact remains for the jury with respect to Kahriger's *prima facie* case, HHS has articulated a legitimate, nonretaliatory reason for demoting and transferring him—his inappropriate texts to Warriner. And Kahriger cannot show this reason was pretextual. *See McDonnell Douglas*, 411 U.S. at 804. A plaintiff asserting a retaliation claim "has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination under Title VII" and must ultimately "prove that retaliatory animus was the 'but-for' cause of the adverse employment action." *Carvalho-Grevious*, 851 F.3d at 258 (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). Kahriger does not do so, nor does he advance any new arguments regarding pretext. Moreover, there is no evidence to suggest that Kahriger would have remained an ARIGAS had he not sent Baiocco his texts with DeLeon.

V

A

Before bringing a hostile work environment claim, a plaintiff "must exhaust all required administrative remedies." *Robinson v. Dalton*, 107 F.3d 1018, 1020–21 (3d Cir. 1997). To do so, a federal employee must contact an EEO counselor within forty-five days of the matter alleged to be discriminatory or, in the case of personnel action, within forty-five days of the effective date of the action. 29 C.F.R.

19

§ 1614.105(a)(1); *see also Robinson*, 107 F.3d at 1021 (holding that "exhaustion requires

. . . consultation with an agency counselor" within forty-five days).  That obligation is

akin to a statute of limitations, and failure to comply renders a claim time-barred.  *See*

*Robinson*, 107 F.3d at 1021–22.

Unlike discrete acts of discrimination, a hostile work environment claim is a

series of separate acts that together amount to an unlawful employment practice.

*Mandel*, 706 F.3d at 165.  An entire hostile work environment claim is thus actionable

so long as one act contributing to the hostile work environment falls within the

forty-five-day window.  *See O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir.

2006) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

Kahriger first contacted an EEO counselor on February 1, 2018.  So at least one

act contributing to his hostile work environment claim must have occurred on or after

December 18, 2017.  Yet the acts comprising his claim occurred well before that date:

- On February 11, 2016, HHS-OIG interviewed Kahriger about allegations that men rated women in the office based on their appearance.  (May 16, 2016 OAS Mgmt. Inquiry.)

- On July 7, 2017, Kahriger learned about the "Don't Date a Player" web post.  (Kahriger Dep. at 34:24–35:19.)

- From September 22 to 26, DeLeon, Warriner, Flores and Pohler reported Kahriger to HHS-OIG.  (Kahriger Complaints.)

- On October 6, Flores supposedly yelled at Kahriger, saying he is a "fucking doofus" and "ain't getting no pussy."  (Second Am. Compl. ¶ 92.)

- On October 10, Frontz ordered Kahriger to telework until further notice.  (Oct. 10, 2017 Email from Jelen to Kahriger.)

Only the effective date of Kahriger's demotion and transfer and the FPS investigation

into Baiocco fall within the forty-five-day window, and Kahriger contends these

incidents make his entire claim actionable.

Discrete acts, like demotion or transfer, are not actionable as part of a hostile

work environment claim. *See O'Connor*, 440 F.3d at 127; *see also Morgan*, 536 U.S. at

113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they

are related to acts alleged in timely filed charges."). Such a claim involves repeated

conduct over days whereas discrete acts only occur on a particular day. *See Morgan*,

536 U.S. at 115. And HHS-OIG demoted and transferred Kahriger on December 24,

2017. *See O'Connor*, 440 F.3d at 127 (finding that termination, denial of transfer,

wrongful discipline, or wrongful suspension don't constitute a continuing violation); *see*

*also Leonard v. SEPTA*, No. 20-2033, 2021 WL 229397, at *4 (E.D. Pa. Jan. 22, 2021)

(holding that a demotion is a "discrete discriminatory act to which the continuing

violations doctrine does not apply"); *Mundie v. Phila. Coll. Of Osteopathic Med.*, 577 F.

Supp. 3d 375, 387 (E.D. Pa. 2021) (finding the same for a transfer).[9]

The FPS investigation doesn't save Kahriger's claim either. FPS investigated

Baiocco after he told Sarah Gerhart, an EEO counselor, that he wanted to "smash Ms.

DeLeon's head in with a baseball bat." *See* (Dec. 13, 2017 Email from Wilson to FPS,

Def.'s Ex. 29, Dkt. No. 42-30). A hostile work environment claim requires "similar

conduct by the same individuals, suggesting a persistent, ongoing pattern." *Doe v.*

*Mercy Catholic Med. Ctr.*, 850 F.3d 545, 566 (3d Cir. 2017) (citation modified) (quoting

---

[9]      Kahriger likewise argues his telework order lasted beyond December 18. *See* (Pl.'s Mem. of
L. in Opp'n at 14). But Frontz issued that order on October 10, and a "continued refusal to return
him to work" does not constitute a continuing violation. *See Zdziech v. DaimlerChrysler Corp.*, 114
F. App'x 469, 472 (3d Cir. 2004).

*Mandel*, 706 F.3d at 167).  Nothing about the FPS investigation concerned Kahriger.
FPS never interviewed him.  It bears no relation to the conduct making up his hostile
work environment claim.  And King, Stasch or Frontz played no part in that
investigation.  *See Oliver v. Clinical Pracs. of Univ. of Pa.*, 921 F. Supp. 2d 434, 445
(E.D. Pa. 2013) ("Acts that are taken by two different supervisors, acting
independently, over different time periods generally demonstrate isolated events rather
than a persistent, ongoing pattern of discrimination.") (citation omitted).

Kahriger contends the web post falls within the forty-five-day window because it
remained online past December 18.  *See* (Hr'g at 117:12–17).  The continuing violation
doctrine "does not apply when plaintiffs are aware of the injury at the time it occurred."
*Morganroth & Morganroth v. Noris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n.6
(3d Cir. 2003).  Indeed, the doctrine's premise is that "the statute of limitations should
not begin to run until a reasonable person would be aware that his or her rights have
been violated."  *Santee v. Lehigh Valley Health Network, Inc.*, No. 13-3774, 2013 WL
6697865, at *7 (E.D. Pa. Dec. 19, 2013).  Kahriger first learned of the web post on July
7—five months before December 18—and still waited over seven months to raise the
issue with an EEO counselor.  *See* (Kahriger Dep. at 52:19–53:23).

B

Even if Kahriger could present his hostile work environment claim, it still fails.
Title VII prohibits "the creation of a hostile work environment" based on an employee's
sex.  *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013); *Caver v. City of Trenton*, 420
F.3d 243, 262 (3d Cir. 2005).  To state a plausible claim for hostile work environment,
Kahriger must establish: (1) he suffered intentional discrimination because of his sex,

(2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected him, (4) the discrimination would detrimentally affect a reasonable person in like circumstances and (5) the existence of *respondeat superior* liability. *Mandel*, 706 F.3d at 167.

Kahriger never addresses these elements, nor does the record allow a reasonable juror to find in his favor. Aside from his subjective beliefs, no evidence indicates that anyone at HHS harassed Kahriger because he is a man. And no reasonable juror could find that any purported harassment was severe or pervasive. To rise to that level, Kahriger's work environment must have been "so pervaded by discrimination that [his] terms and conditions of employment were altered." *Vance*, 570 U.S. at 427. None of the incidents he cites were physically threatening, severe or humiliating. Though they may seem offensive to Kahriger, they do not paint a picture of an environment teeming with "extremely serious" harassment that altered Kahriger's entire working environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.

23